IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00098-CMA-GPG

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     MEGAN HESS,

      Defendant.

---

## PLEA AGREEMENT

---

     The United States of America (the government), by and through Jeremy Chaffin and Tim Neff, Assistant United States Attorneys for the District of Colorado, and the defendant, Megan Hess, personally and by counsel, Daniel Shaffer and Ashley Petrey, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.  This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

### I.      AGREEMENT

**A. Defendant's Plea of Guilty:**

The defendant agrees to

(1)    plead guilty to Count 1 of the Indictment charging a violation of Title 18, United States Code, Section 1341, mail fraud and aiding and abetting; and

(2)    comply with any other obligations as disclosed to the Court.

**B. Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A). The government agrees to move to dismiss the remaining counts in the Indictment with prejudice, against

Page 1 of 21

**EXHIBIT**
1

this defendant only.  Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a superseding indictment.

## II.        ELEMENTS OF THE OFFENSE(S)

The parties agree that the elements of mail fraud in violation of Title 18, United States Code, Section 1341 are as follows:

### Count One:  18 U.S.C. § 1341

*First:*         the defendant devised or intended to devise a scheme to defraud, as alleged in the indictment;

*Second:*     the defendant acted with specific intent to defraud;

*Third:*         the defendant mailed something or caused another person to mail something through a private or commercial interstate carrier for the purpose of carrying out the scheme;

*Fourth:*      the scheme employed false or fraudulent pretenses, representations, or promises that were material.

## III.       STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 1 of the Indictment are: not more than 20 years imprisonment; a maximum term of supervised release 3 years; a maximum fine of $250,000 or, in the alternative, the greater of twice the gross gain or twice the gross loss; $100 mandatory victim's fund assessment fee; restitution in an amount to be determined at the time of sentencing.

## IV.      COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.       STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct.

In May 2009, the defendant organized Sunset Mesa Funeral Foundation, Inc. ("SMFF") as a nonprofit corporation purportedly to "provide assistance to community members who have no resources for funeral/cremation services."  The defendant also created a Trade Name for SMFF known as Donor Services.  The purpose of Donor Services was to harvest human remains—such as heads, torsos, arms, legs, and entire human bodies—and market them for sale to customers who used the remains for scientific, medical, or educational purposes (hereinafter "body broker services").  The defendant operated Donor Services out of the same location as a funeral business operating under the name Sunset Mesa Funeral Directors ("SMFD") in Montrose,

Colorado.

In September 2011, the defendant purchased SMFD on behalf of SMFF. The defendant then registered SMFD as a Trade Name for SMFF. From that time until February 2018, the defendant operated a funeral home under that Trade Name. The defendant handled most aspects of SMFD and Donor Services and managed the activities of others involved in the businesses, including her co-defendant. As part of these operations, the defendant personally met with individuals and families seeking funeral services. The defendant also handled most of the advertisement, invoicing, and shipping for Donor Services, and dealt with the body broker services customers.

Beginning in 2010 and continuing into 2018, the defendant, in connection with others, devised and executed a scheme and artifice to defraud and obtain money and property from the victims by means of materially false and fraudulent pretenses, representations, and promises. In summary, the defendant and others stole the bodies or body parts of hundreds of victims, and then sold those remains to victims purchasing the remains for body broker services.

Under the auspices of SMFD, the defendant would frequently meet with victims seeking cremation services for themselves or their loved ones who had died. During these meetings, the defendant and others would represent to victims that SMFD would cremate decedents and provide their cremated remains (hereinafter "cremains") back to the families. Instead, the defendant and others would harvest body parts from, or prepare the entire bodies of, the decedents for sale in body broker services. Frequently, the defendant and others neither discussed nor obtained authorization for donation of any bodies or body parts for body broker services. In other instances, the

topic of donation was raised by the defendant or others, and specifically rejected by the victims. Despite lacking any authorization, bodies or body parts of hundreds of individuals were sold by the defendant through Donor Services for body broker services.

In some instances, victims would agree to donation. In obtaining these agreements, the defendant and others would make various materially false representations. Some victims were misled to believe that only small samples, such as tumors or portions of skin, would be taken for testing or research. Other victims believed, based on representations from the defendant or others, that donated remains would be used to treat living recipients. Still others authorized donation of only specified body parts, such as specific organs, but denied donation for anything else. Frequently, even when victims agreed to donation, the defendant and others exceeded the authorization they obtained. Body parts beyond those which were authorized, if not entire bodies, would be sold typically for purposes not even contemplated or agreed to by the victims. In each of these instances, the victims would not have authorized donation had they been informed of what the defendant intended.

The defendant advertised the remains sold through Donor Services as legitimately and freely donated for body broker services when this often was not the case. Indeed, the defendant and others used and developed "Donor Authorization" forms that purportedly would be signed by victims when donation was authorized. Donor Services files showed that the bodies or body parts of 811 separate individuals were sold through Donor Services for body broker services. However, donor authorization forms were present in the files associated with only 447 of those individuals; the files associated with the remaining 364 contained no records

documenting authorization of donation at all. And, of the 447 files containing authorization forms, at least 187 were determined to be forgeries.

Similarly, through hundreds of interviews, agents confirmed that the bodies or body parts of at least 222 victims were stolen, in that the defendant or others either never received authorization for donation or exceeded the authorization that they received. In contrast, agents only identified 42 individuals whose bodies or body parts were procured by the defendant through informed consent.

In addition to the 222 victims whose bodies or body parts were confirmed stolen, agents identified an additional 338 victims whose bodies or body parts were almost certainly stolen. Many of the files associated with these victims contained forged donor authorization forms. For others, their bodies were sent to SMFD for cremations from other funeral homes that contracted with the defendant. Interviews with these funeral homes confirmed that donation was neither discussed with the victims nor authorized by the contracting funeral homes. For the final 209 individuals whose bodies or body parts were sold through Donor Services, agents have been unable to determine whether informed consent was obtained.

The victims that purchased remains from Donor Services relied on the defendant's representations that the remains were legitimately donated. As discussed above, that was mostly untrue. These victims would not have purchased the remains had they known the remains were not, in fact, donated and instead were stolen.

Many of the victims that purchased remains through Donor Services also required that any remains be free of particular infectious diseases, namely HIV and Hepatitis. The defendant and others would submit blood samples from remains for

testing.  In dozens of instances, the defendant received results showing the remains tested positive for these diseases.  Rather than inform the victims of this fact, the defendant forged laboratory reports to falsely indicate the remains tested negative for the infectious diseases.  The victims would not have purchased the remains had they known that the remains were infected with these diseases.

In executing the scheme, the defendant arranged for numerous shipments of fraudulently obtained bodies and body parts through private and commercial interstate carriers.  For example, in April 2015, the defendant arranged for a shipment of bodies and body parts procured from sixteen separate individuals to a victim purchasing the remains for body broker services.  Of these sixteen individuals, the remains from twelve individuals were either fraudulently obtained by the defendant or fraudulently represented as free of infectious diseases.  These remains were transported by a commercial interstate carrier using air freight—between April 22 and 24, 2015—flying from Denver to Chicago.  The shipment contained the remains of the following individuals.

J.B.

J.B. died in February 2015.  His wife began making final arrangements shortly before his death.  Finding that SMFD was the most economical option, she met with the defendant to discuss her husband's wishes to be cremation.  During this conversation, the defendant inquired whether J.B. was an organ donor, to which his wife responded, "I don't think so."  There was no further discussion of donation at any point in the funeral arrangements.  Neither J.B. nor his wife agreed to donate any of his body parts for body broker services.  There was also no donor authorization form for J.B. in the SMFD and

Donor Services files.  Nevertheless, a review of the Donor Services files showed that one of J.B.'s legs from the knee to the toe tip was harvested and included in the shipment.  This body part was not recovered during the investigation.

V.H.

V.H. died in February 2015.  After his death, V.H.'s wife went to SMFD for cremation services.  V.H.'s wife met with the defendant to go over paperwork for the cremation.  During this meeting, the defendant inquired whether V.H. was an organ donor on his driver's license.  V.H.'s wife explained that he was, but that his organs were not donated at the hospital.  There was no further discussion of donation.  V.H.'s wife did not authorize donation of any of V.H.'s body parts for body broker services. There was also no donor authorization form for V.H. in the SMFD and Donor Services files.  Nevertheless, a review of the Donor Services files showed that one of V.H.'s legs from the knee to the toe tip and one of his arms from the shoulder to the fingertip were harvested and included in the shipment.  These body parts were not recovered during the investigation.

H.B.

H.B. died in February 2015.  After his death, his grandson went to SMFD and met with the defendant to arrange for cremation.  At no point during these meetings was the topic of donation ever discussed.  H.B.'s grandson did not authorize donation of any of H.B.'s body parts for body broker services.  There was also no donor authorization form for H.B. in the SMFD and Donor Services files.  Nevertheless, a review of the Donor Services files showed that one of V.H.'s legs from the knee to the toe tip, one of his arms from the shoulder to the fingertip, and his other shoulder were harvested and

included in the shipment. A portion of these body parts—a clavicle—was still in the possession of the victim that purchased these body parts. The clavicle was collected as evidence and submitted for DNA testing. Comparison of DNA obtained from the clavicle and DNA from H.B.'s daughter showed that it is 3.8 million times more likely that the clavicle came from H.B. than from someone unrelated to his daughter.

S.M.

S.M. died in March 2015. His son went to SMFD and requested cremation. At no point did S.M.'s son authorize donation of any of S.M.'s body parts for body broker services. There was also no donor authorization form for S.M. in the SMFD and Donor Services files. Nevertheless, a review of the Donor Services files showed that S.M.'s foot/ankle was harvested and included in the shipment. This body part was not recovered during the investigation.

C.S.

C.S. died in March 2015. Her husband contacted SMFD to make her final arrangements and met with the defendant. During this meeting, the husband requested a cremation, and the topic of donation never came up. C.S.'s husband did not authorize the donation of any of C.S.'s body parts for body broker services. There was also no donor authorization form for C.S. in the SMFD and Donor Services files. Nevertheless, a review of the Donor Services files showed that C.S.'s head and both of her legs from the knee to the toe tip were harvested and included in the shipment. A portion of these body parts—C.S.'s head—was still in the possession of the victim that purchased these body parts. The head was collected as evidence and submitted for DNA testing. Comparison of DNA obtained from the head and DNA from C.S.'s daughter showed that

it is 24 million times more likely that the head came from C.S. than from someone unrelated to her daughter.

R.S.

R.S. died in March 2015.  His son arranged for cremation through personnel at the long-term care facility R.S. had resided at.  The facility recommended SMFD for services and assisted with the arrangements.  There was never any discussion of donation.  R.S. did not authorize the donation of any of R.S.'s body parts for body broker services.  There was also no donor authorization form for R.S. in the SMFD and Donor Services files.  Nevertheless, a review of the Donor Services files showed that R.S.'s entire body was included in the shipment.  R.S.'s body was not recovered during the investigation.  Later, R.S.'s son received cremains from SMFD that were represented as that of his father.  This was not true.

R.L.

R.L. died in March 2015.  His sister contacted SMFD to make his final arrangements.  She met with the defendant and requested a cremation.  The topic of donation never came up in their conversations.  R.L.'s sister did not authorize the donation of any of R.L.'s body parts for body broker services.  There was also no donor authorization form for R.L. in the SMFD and Donor Services files.  Nevertheless, a review of the Donor Services files showed that both of R.L.'s feet/ankles were harvested and included in the shipment.  These body parts were not recovered during the investigation.

E.F.

E.F. died in March 2015.  His family contacted SMFD and requested cremation.

E.F.'s wife reported that no one authorized the donation of E.F.'s body parts for body broker services. There was also no donor authorization form for E.F. in the SMFD and Donor Services files. Nevertheless, a review of the Donor Services files showed that E.F.'s head, both of his arms from the should to the fingertip, one of his legs from the knee to the toe tip, and his other foot/ankle were harvested and included in the shipment. These body parts were not recovered during the investigation.

R.E.

R.E. died in March 2015. His wife contacted SMFD and spoke with the defendant about his final arrangements. The defendant asked if R.E. was a donor. R.E.'s wife explained that he was but that he had not been taken to the hospital for organ donation. The defendant did not ask anything further about donation. R.E.'s wife explained to agents that had she been asked to donate R.E.'s body parts for body broker services she would have refused. The SMFD files contained a donor authorization form for R.E. purportedly signed by R.E.'s wife, along with a copy of her driver's license. Agents provided R.E.'s wife with a copy of the form. After reviewing it she indicated it was a forgery. She explained that she did not recognize the form and that while the signature on the form was similar to hers, it was very vertical whereas her actual signature is typically slanted. A review of the Donor Services files showed that R.E.'s head, his spine, and both of his legs from the knee to the toe tip were harvested and included in the shipment. These body parts were not recovered during the investigation.

S.M.

S.M. died in March 2015. Her husband arranged for her cremation through the

defendant at SMFD. During his interaction with the defendant, the topic of donation was never discussed. S.M.'s husband did not authorize the donation of any of S.M.'s body parts for body broker services. There was also no donor authorization form for S.M. in the SMFD and Donor Services files. Nevertheless, a review of the Donor Services files showed that S.M.'s head, one of her arms from the shoulder to the fingertip, and both of her feet/ankles were harvested and included in the shipment. These body parts were not recovered during the investigation.

A.J.

A.J. died in April 2015. His wife contacted SMFD to make his final arrangements. She spoke with the defendant. During the conversation, the defendant asked if A.J. was listed as a donor on his driver's license. The defendant explained that she would offer a discount on services if she agreed to donation. A.J.'s wife told the defendant that she was not interested in donation and only wanted a cremation. The defendant made no further mention of donation. A.J.'s wife did not authorize the donation of any of A.J.'s body parts for body broker services. There was also no donor authorization form for A.J. in the SMFD and Donor Services files. Nevertheless, a review of the Donor Services files showed that A.J.'s entire body was included in the shipment. A.J.'s body was not recovered during the investigation. Approximately a week after requesting a cremation, the defendant called A.J.'s wife and informed her that A.J.'s cremains were ready to be picked up. Later, A.J.'s wife received cremains that were represented as that of her husband. This was not true.

R.D.

R.D. died in March 2015. Her daughter contacted SMFD to make final

arrangements. During a conversation with the defendant, R.D.'s daughter was asked if she would be willing to consent to donation. The daughter understood that R.D.'s body parts would be used for scientific purposes; the daughter consented to this. A donor authorization form located in the SMFD files documented this consent. Later, however, R.D.'s daughter spoke with the defendant and learned that her mother had some form of hepatitis. The defendant told R.D.'s daughter that none of R.D.'s body parts were donated. This was not true. A review of Donor Services files showed that R.D.'s head was harvested and included in the shipment. The files also contained a laboratory report that purported to indicate that R.D. tested negative for infectious diseases. The defendant submitted this report to the victim that purchased the body parts. However, this report was a forgery. Records obtained directly from the laboratory showed that the lab issued a report to Donor Services stating that testing of R.D.'s blood showed the presence of Hepatitis C. The defendant never shared these results with the victim that purchased R.D.'s remains. R.D.'s head was still in possession of the victim that purchased her remains. The head was collected as evidence, but was not submitted for DNA analysis.

In this shipment, the defendants was paid $10,175 for bodies or body parts that were either stolen or infected. In addition, the defendant was paid $11,290.03 for funeral services related to these individuals. The victims would not have paid the defendant for these funeral services or for the remains had they known the truth. Accordingly, from this shipment alone, the government asserts that the defendant caused a loss of at least $21,465.03. This was simply one of numerous shipments made in furtherance of the scheme.

Indeed, the income derived from Donor Services allowed the defendant to advertise rates for cremations that typically made SMFD the least expensive option in the area. As a result, the defendant was able to ensure a constant supply of bodies for her scheme. In hundreds of instances, a victim's entire body was sold through Donor Services. In other instances, body parts were harvested and sold and only a portion of a victim's body was cremated. The families were then provided with cremains that were represented as that of their loved ones when that was not true. Instead, these families were given cremains that were replaced or supplemented by the defendant and others with the cremains of another person or persons. Despite this, the families were charged, and typically paid $1000 or more, for cremations that never occurred and funeral services that they would not have agreed to had they been informed of the truth.

As noted above, the government identified 560 victims whose bodies or body parts were stolen. Of these, bank records show that the defendant and her businesses received $441,779.05 for funeral services associated with 331 of these victims. The government was unable to locate transactions specifically associated with the remaining 229 victims. However, using the average payment for funeral services from known information, the government estimates that the defendant received an additional $291,089.25 for funeral services associated with these 229 victims. Because the victims would not have paid the defendant anything had they been aware of what would occur, the government estimates that the actual loss to these victims was at least $732,868.30. The defendant disputes the government's loss calculations.

In addition to income derived from fraudulent funeral services, bank records show the defendant received over $1.2 million for remains sold through Donor Services.

As discussed above, the majority of these remains were stolen and would not have been purchased by the victims had they known the truth.  For 199 of the 560 victims whose bodies or body parts were stolen, agents were able to determine the amounts the defendant charged for at least one body part.  Importantly, because of poor record keeping and incomplete information, agents were often only able to determine the amounts charged for a portion of these victims' remains.  Nevertheless, agents determined that the defendant sold at least $181,271.14 in stolen remains harvested from the 199 victims discussed above.  Utilizing the average value of remains per victim based on known information, the government estimates that the total value of the stolen remains sold by the defendant was at least $527,145.70.  Because the victims would not have purchased stolen remains, the government asserts that this entire value is properly considered as loss.  Again, the defendant disputes the government's loss calculation.

In total the government asserts that the defendant's criminal actions resulted in a loss of no less than $1,260,014.00.  The defendant asserts that the loss is less than $250,000.  The proceeds the defendant obtained through the scheme were used to purchase or pay for the assets identified in the forfeiture allegation.

The parties agree that the defendant's criminal conduct involved more than 10 victims.  However, in addition to the government's loss calculation, the defendant also disputes specific offense characteristics and adjustments asserted by the government.

The government asserts that the defendant misrepresented her affiliation with charitable and/or educational organizations.  Marketing materials developed by the defendant indicated an affiliation with a non-profit organ procurement organization in

Colorado when that was not true.  Indeed, an officer of that organization specifically met with the defendant and instructed her not to mislead the public regarding her affiliation. Despite this, the defendant continued to use brands and logos of the organization in her marketing materials.  Similarly, in conversations with victims, the defendant would misrepresent what body parts would be used for, informing victims that tissue would be used in living donors when that was not possible.  Indeed, an employee of the defendant reported that the defendant instructed her to claim in marketing presentations that body parts donated through Donor Services had helped the blind to see and a soldier to walk again when none of this was true.  The defendant disputes the factual basis for this offense characteristic.

The government also asserts that the defendant utilized sophisticated means in her scheme to defraud.  By combining her funeral home business and Donor Services, the defendant ensured no oversight over her activities, allowing her to continue her scheme for nearly a decade unabated.  This resulted in legislation in Colorado to ensure no future operations can combine such businesses in a similar manner.  This aspect alone should constitute sophisticated means.  Moreover, the defendant's scheme involved the forgery of hundreds of donor authorization forms and dozens of laboratory reports, extensive marketing efforts, and a sophisticated knowledge of the industry sufficient to not arouse the suspicions of various authorities as well as educational and scientific organizations.  The government asserts that the means in which the defendant accomplished her scheme were especially complex and intricate.  The defendant disputes this offense characteristic.

Next, the government asserts that the defendant's conduct involved a conscious

or reckless risk of serious bodily injury or death.  The defendant shipped remains that had tested positive for various infectious diseases, and affirmatively hid that information from purchasers.  The defendant also ignored public safety regulations regarding hazardous materials that would have disclosed the infectious materials.  In doing so, she and others placed her employees, her customers, individuals involved in the shipments, and the public at risk of serious bodily injury or death.  Again, the defendant disputes the application of this offense characteristic.

Additionally, the government asserts that the offense involved a large number of victims that the defendant knew or should have known were vulnerable victims.  Indeed, hundreds of the victims dealt with the defendant during a time of significant grief, shortly after the death of their loved ones.  The defendant took advantage of this vulnerability in her scheme.  The defendant disputes that this adjustment should apply.

The government also asserts that the defendant held an aggravated role in the criminal activity.  As discussed, the defendant personally handled most aspects of the scheme.  She met with victims, arranged for shipments, and negotiated sales.  In doing so, she supervised and directed the actions of her co-defendant.  Thus, the government asserts that the defendant was an organizer, leader, manager or supervisor of any criminal activity.[1]  The defendant disputes this adjustment.

---

[1] At present, the government believes that a two-level increase is applicable under USSG § 3B1.1(c).  However, the government notes that greater increases may be applicable under § 3B1.1.  While only two participants were charged in this matter, the Court could determine that there were a greater number of participants using the lower standard applicable to guideline determinations.  *See United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir. 2005) (reaffirming that guideline determinations are made through the application of the preponderance standard).  Similarly, given that the defendant utilized the services of numerous employees (with varying levels of

Finally, the government asserts that the defendant's position as owner and manager of a funeral home and a funeral director placed her in a position of public and private trust that she abused in devising and executing her scheme.  The defendant disputes any adjustment on this basis.

## VI.        ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553.  In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission.  In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines.  To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate.  The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range.  To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

---

awareness as to the circumstances) and outsiders, the Court could determine that the criminal activity in this case was "otherwise extensive."  *See* USSG § 3B1.1 cmt. n. 3 ("In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.").

Calculations Not In Dispute

a)    Under Section 2B1.1, the base offense level is 7.  USSG § 2B1.1(a)(1)

b)    There is a two-level increase because there are 10 or more victims.  USSG 2B1.1(b)(2).

c)    There may be as much as a three-level decrease based on the defendant's acceptance of responsibility.  USSG § 3E1.1(a), (b).

Government's Calculation

d)    The government asserts that the loss resulting from the defendant's conduct was more than $550,000.  This results in a 14-level increase in the offense level.  USSG § 2B1.1(b)(1)(H)

e)    The government asserts there is a two-level increase based on the defendant's misrepresentations that she was acting on behalf of a charitable or educational organization.  USSG § 2B1.1(b)(9)(A).

f)    The government asserts there is a two-level increase because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.  USSG § 2B1.1(b)(10)(C).

g)    The government asserts there is a two-level increase because the defendant's conduct involved a conscious or reckless risk of death or serious bodily injury.  USSG § 2B1.1(b)(16).

h)    The government asserts there is a four-level increase because there were a large number of vulnerable victims.  USSG § 3A1.1(b)(1)-(2).

i)    The government asserts that there is at least a two-level increase because the defendant was an organizer, leader, manager, or supervisor of the criminal activity.  USSG § 3B1.1(c).

j)    The government asserts there is a two-level increase because the defendant abused a position of public or private trust.  USSG § 3B1.3.

k)    Therefore, the government believes the Total Adjusted Offense level would be 34.

Defendant's Calculation

l)   The defendant asserts that the loss resulting from her conduct may
be less than $250,000.  This would result in no more than a 10-
level increase.  USSG § 2B1.1(b)(1)(F).

m)   The defendant asserts that there are no other adjustments that
would apply.

n)   Therefore, the defendant believes the Total Adjusted Offense Level
may be as low as 16.

Advisory Guideline Range

o)   The parties understand that the defendant's criminal history
computation is tentative and based on the defendant's prior
convictions.  The parties believe the defendant is in criminal history
category I.

p)   The career offender/criminal livelihood/armed career criminal
adjustments do not apply.

q)   The advisory guideline range resulting from the government's
calculations is 151-188 months.  The advisory guideline range
resulting from the defendant's calculations is 21-27 months.
However, in order to be as accurate as possible, with the criminal
history category undetermined at this time, the offense level(s)
estimated above could conceivably result in a range from 21
months (bottom of Category I, offense level 16) to 327 months (top
of Category VI, offense level 34).  The guideline range would not
exceed, in any case, the cumulative statutory maximums applicable
to the counts of conviction.

r)   Pursuant to guideline § 5E1.2, assuming the highest estimated
offense level above, the fine range for this offense would be
$35,000 to $350,000, plus applicable interest and penalties.

s)   Pursuant to guideline § 5D1.2, if the Court imposes a term of
supervised release, that term would be at least one year, but not
more than three years.

t)   The defendant's sentence may also include an order of restitution
in an amount to be determined at sentencing.

The parties understand that the Court is free, upon consideration and proper

application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor

## VII.    ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 6/10/22

MEGAN HESS
Defendant

Date: 6/10/22

DANIEL SHAFFER
Attorney for Defendant

Date: 6-13-2022

JEREMY CHAFFIN
Assistant U.S. Attorney