IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No.  1:20-CR-00098-CMA-GPG-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

    1.  Megan Hess,

      Defendant.

---

### DEFENDANT MEGAN HESS'S SENTENCING STATEMENT

### AND

### REQUEST FOR DOWNWARD VARIANCE

---

"Witch."  "Hag."  "Evil."  "Scum."  "Ghoul."  "Skunk."  "Monster."  "Disgusting cow." "Bitch."  "The local Carole Baskins."  "Hacksaw Hess."

"This bitch needs to rot."  "I hope she rots in hell."  "These ghouls will be embalmed before they are convicted."

"I hope she dies."

These are all things the next of kin of the decedents involved in this case have publicly said to and about Megan Hess.

Megan Hess is a broken human being. She may even deserve at least some of the vitriol she has received in recent years. But she is also a Mother. Sister. Daughter. Friend. Coloradan. Entrepreneur. She is a person. She has many redeeming qualities. She has her own story to tell.

And Megan Hess's story, as juxtaposed against the facts of the case itself and analyzed under a basic framework of federal criminal law, calls for only a reasonable sentence - nothing more.

Given the foregoing, Megan Hess, by and through her attorneys, Ashley Petrey and Dan Shaffer, hereby request this Honorable Court impose a sentence consistent with the requirements of 18 U.S.C. 3553(a); that is, a sentence sufficient but not greater than necessary to comply with the purposes of federal sentencing, and not a sentence consistent only with the extreme and uncomfortable emotions generated by the independent facts of the case standing alone.

If the Court agrees with Ms. Hess's objections to the government and United States Probation's guideline application and loss calculation, Ms. Hess's guideline range will be appreciably reduced from both of their current projections, and so she would then request a sentence at the bottom of that reduced range. If, however, the Court denies Ms. Hess's objections either in whole or in part, she respectfully requests it consider this sentencing memorandum in support of her request for a downward variance.

**18 U.S.C.A. § 3553(a)(1) – The Court Shall Consider the History and Characteristics of the Defendant and Nature and Characteristics of the Offense.**

The Court has authority to impose sentences that are less severe than those recommended by the United States Sentencing Guidelines, and in exercising this authority, a court may consider, without limitation, any information about the defendant's background, character, and conduct.   *U.S. v. Jaroszenko*, C.A.7 (Ill.) 1996, 92 F.3d 486.  Indeed, 18 U.S.C. 3553(a)(1) is written so that the history and characteristics of the defendant are analyzed simultaneously with and weighed the same as and against the nature and characteristics of the offense.

Here, the subsection (a)(1) factors as applied to both the evidence in this case and the nature and character of this Defendant do not support an upward variance of 240 months, the statutory maximum, nor do they support a sentence at the top of the guidelines.

**18 U.S.C.A. § 3553(a)(1), part one - The Court Shall Consider the History and Characteristics of the Defendant.**

Submitted soon after the time of this filing will be a mitigation memo prepared by forensic social worker (FSW) Madison Hobby, who has been working with Ms. Hess since November of 2020.  Given the volume of personal and sensitive information contained within FSW Hobby's mitigation memo, it will be filed by United States Probation as a level II restricted document pursuant to D.C.COLO.LCrR 32.1(e).  As FSW Hobby's memo provides the most comprehensive exposition of Megan Hess's

history and personal characteristics, Ms. Hess hereby incorporates it within the contemporaneous filing per reference.

Megan's all-encompassing purpose in life is to nurture and provide for her 12-year-old daughter, P.H., who is a bright young woman with exceptional grades and participates in numerous extra-curricular activities.  At the top of page 4 of her mitigation memo, FSW Hobby notes that "[s]ince Megan has been on bond, she has complied with all the terms and conditions of the court [… and] continues to care for her daughter, [P.H.], and maintain a job through creative outlets including homemade crafts that she sells on Etsy, and interior design."  FSW Hobby adds that "[d]uring several interviews with this social worker, Megan stated, 'My daughter is my world, I just want to make sure she is happy, and I do everything in my power to make her happy and keep her busy with activities.  I am so worried that if I am taken away from her she won't make it.'"

Ms. Hess's daughter, P.H., tells FSW Hobby that she does "everything with my mom, she makes sure my homework is done, takes me to dance, helps me with anything I need."  P.H. calls Ms. Hess a "supermom" who "everyone needs" – as for any future custodial sentence, P.H. states "[i]f [my mom] isn't around things will fall apart."

Regardless of whatever sentence the Court decides to impose, it is generally understood among the parties and per the plea agreement that Ms. Hess will likely be going to prison for a period of time, perhaps for most if not all of her daughter's formative years.  The basic issue, then, before this Court is to decide whether Ms. Hess will get out of prison at an age where her daughter will be graduating high school, or, if

4

the Court accepts probation's drastic recommendation for an upward variance to the statutory maximum, when her daughter will be in her early 30s.  Or, rather, given Ms. Hess's middle age and the lowered life expectancy of long-term "older offenders" in the federal system, will Ms. Hess never walk beyond the walls of a prison again, sentenced to what amounts to a de facto death sentence for her non-violent crimes?

> **i.       Megan Hess is on the cusp of becoming an "older offender" and statistically unlikely to recidivate upon her eventual release from custody.**

In July of 2022, the United States Sentencing Commission published a 68-page report entitled "Older Offenders in the Federal System"[1].  The definition of "older" as applied to offenders in the federal system is 50 and older.  This is because 1) since the aging process accelerates once an offender is incarcerated, offenders can feel relatively old at a younger age, and therefore physical changes may stand out earlier; and 2) even in the general population, decline in cognitive functioning – as a marker of aging – begins most prevalently around the age of 50.[2]

---

[1] Kristin M. Tennyson, Ph.D., Lindsey Jeralds, M.A., and Julie Zibulsky, J.D., *Older Offenders in the Federal System,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf, page 1, accessed December 11, 2022.

[2] *Older Offenders in the Federal System*, page 2; *see also* Susan Baidawi & Christopher Trotter, *Psychological Distress Among Older Prisoners*, 22 J. Corr. Health Care 354 (2016); Bryce Evan Stoliker & Joseph Varanese, *Spending the Golden Years Behind Bars: Predictors of Mental Health Issues Among Geriatric Prisoners*, 12 Victims & Offenders 718 (2017); Robert G. Falter, *Selected Predictors of Health Services Needs of Inmates Over Age 50*, 6 J. Corr. Health Care 149 (1999); Helene Merkt, Sophie Haesen, Leila Meyer, Reto W. Kressig, Bernice S. Elger & Tenzin Wangmo, *Defining an Age Cut-Off for Older Offenders: A Systematic Review of Literature*, 16 Int'l J. Prisoner Health 95 (2020), in which the authors conducted a meta-analysis of 100 scholarly articles to determine the mean cutoff age for "older" offenders and the justifications for using that age; 48 studies used the cut off as age 50."

According to the United States Sentencing Commission, "[r]ecognizing that 'death in prison is not to be ordered lightly,' courts often consider evidence of life expectancy in cases in which a sentence may amount to a life sentence."  Tennyson, et. al., *Older Offenders*, p. 8.  Less than one percent (0.1%) of all federal offenders received a statutory life sentence in fiscal year 2021, and few offenders (0.2%) received a sentence sufficient in length to qualify as a de facto life sentence.  *Id.*, p. 40.

The Commission also found that the recidivism rate of older offenders (21.3%) was less than half that of offenders under the age of 50 (53.4%).  This means that statistically, only two out of 10 older offenders will recommit crimes in their lifetime, many of whom from *that* small subsect also have *substantial* prior criminal histories:

| | Offenders Under 50 (n=28,044) | Older Offenders (n=4,091) |
|---|---|---|
| **Percent Rearrested** | 53.4% | 21.3% |
| **Median Time to Recidivism Event** | 19 Months | 20 Months |
| **Median Number of Recidivism Events** | 3 | 1 |
| **Most Common Post-Release Event** | Assault (21.2%) | Probation/Parole/ Supervised Release Violation (16.0%) |

Tennyson, et. al., *Older Offenders*, p. 42, Table 5.

Given the general understanding between the parties regarding Ms. Hess's foreseeable prison sentence, the following table will assist the Court in its analysis of an

appropriate length pursuant to not only this subsection, 18 USC 3553(a)(1), but also 18 USC 3553(a)(2)(C), "the need to protect the public from future crimes of the defendant":

*Figure C-1.  Rearrest Rates by Age at Sentencing and Release*



*See* Tennyson, et. al., *Older Offenders*, p. 53.

As one can see from the above-pasted table, recidivism rates continue to fall as an offender ages.

Megan Hess is only a scant few years from turning 50 and had no criminal history of any kind prior to the instant case.  Ms. Hess ceased all criminal activity in 2018, almost five years ago, and has not committed any new crimes or violations of pretrial release since.  She rarely leaves her home (*see* FSW Hobby's mitigation memo, p. 22) and ekes out a very modest living selling homemade goods and crafts on Etsy (*see* PSR, page 24, para. 117).  These demographics reflect the statistical unlikelihood of recidivism and weigh strongly in favor of a less severe sentence.

### ii.    Megan Hess has no criminal history.

Criminal history is one of the strongest predictors of future recidivism.  A federal offender's criminal history category is closely correlated with recidivism rates, and each additional criminal history point is generally associated with a greater likelihood of recidivism.  *See* Tennyson, et. al., *Older Offenders*, p. 52; *see also* Kim Steven Hunt, Ph.D. & Robert Dumville, *Recidivism Among Federal Offenders: A Comprehensive Overview*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf, page 5 (March 2016).

Megan Hess lived a law-abiding life until she was in her 30s, when her conduct comprising the instant offense began to surface.  She was, however, up until and even throughout that time, an active member of the community and extremely dedicated mother.  She plans to remain as such even while incarcerated.  She has no criminal history and no criminal history points, an important factor for this Court to take into consideration pursuant to 18 U.S.C. 3553(1)(a) (as well as subsections (2)(c) and (6)).  She willingly ceased all criminal activity in 2018, two years before indictment, and remains a law-abiding member of society to this day.

Ms. Hess's lack of criminal history combined with her voluntary, pre-indictment cessation of criminal activity is a significant indicator Ms. Hess will not recidivate upon release and weighs strongly in favor of a less severe sentence.

iii.     **Megan Hess's motive for the offense was to continue to be able to provide and, in some cases, waive, cremation expenses for low-income families in the community, as well as assist the scientific community, from medical schools to CME (continuing medical education) organizations, in their never-ending requirement for organ and tissue donation for medical education and research.**

A defendant's motive is highly relevant at sentencing.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 2007 WL 1430288 (10th Cir. 2007); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. 10 Wis. 2005).

Here, there is no evidence Megan Hess's crimes were motivated by greed or that she lived anything other than a solidly middle-class lifestyle.  On the contrary, the deep-dive conducted into her finances by probation (*see* PSR, pages 23-25) revealed a single mother of only modest means who drives a 16-year-old car with a $1500 Blue Book value and is currently deep in debt.  A forensic accountant at Betzer, Call, Lausten & Schwartz (of Denver) hired by counsel reviewed the government's discovery and Ms. Hess's financial records and opined there was no evidence of excessive spending, flashy living, or extravagant expenses.  Indeed, neither the government nor any of the government's witnesses, whether professional or civilian, can definitively point to any examples of what has been repeatedly characterized as a luxurious lifestyle.

Although Ms. Hess acted at times without authorization and, in other cases, outside the parameters of authorization, her motives were not altogether unsavory. She used her business to do good in the community. She held fundraisers for fallen law enforcement officers, donated her time and money to local organizations, and coordinated events for the elderly. She is proud that her funeral home never turned anyone away because of their inability to pay - when Sunset Mesa shut down in 2018, it was owed hundreds of thousands of dollars from both previous civilian clients and government entities alike. *See* FSW Hobby's mitigation memo, p. 12-18; *See also* Exhibit A, showing SMFD waited six and eight months after services were provided to seek payment on an overdue account; Exhibit B, thank you letter from hospice regarding $2,500 gift.

Additionally, the money Ms. Hess received from legitimate medical companies such as Innoved, Smith & Nephew, and Axogen were either at or below standard market prices. Even the government's own investigation found that "a human body can be valued between $3,000-$10,000 and whole fresh uncut human cadavers typically bring $5,000-$6,000. A human head in contrast typically brings $500-$800." Given that Ms. Hess's Donor Services, Inc. would only receive between $1,333-$3,300 for a whole human body and $350 for a human head, which included costs for storage, blood testing, embalming, and shipping, it is clear Ms. Hess was receiving far less than the market price and only enough to cover the reasonable costs of doing business.

The organ and tissue donation for medical education and research industry is in no way a seedy, underground, or back-alley industry, regardless of any hyperbole that

may have been pushed to the contrary in connection with the instant case.  A voluntary

international organization, the American Association of Tissue Banks, boasts a

whopping 127 member-accredited body brokers on their website at

https://www.aatb.org/accredited-bank-search.  The United States would not have such a

thriving medical education industry without the existence of organ and tissue donation

for the purpose of medical education and research.  (Please also refer to pages 19-22

of this filing for more information about organ and tissue donation for the purpose of

medical education and research.)

　　　　Although, as Ms. Hess correctly admitted, she recovered human remains for

education and research without authorization and, in other cases, *exceeded* the

authorization she was given, literature she created and distributed in connection with

Donor Services did not mislead those she serviced as to the *purpose* of donation:

> "Donors who donate their body to science make it
> possible for surgeons and doctors to train on new procedures,
> scientists to develop new medical treatments, companies to
> develop safe medical devices, and patients to experience
> reduced post-surgery recovery times and infections.
> Everyday lives are impacted by lifesaving organ donation, as
> well as body donation to science. […]"

　　　　Notwithstanding her good intentions, there was a definitive turning point where

Ms. Hess crossed the line from enthusiasm for her work and passion for her

contributions to the medical community to engaging in fraudulent activity as a means to

an end in pursuit of those goals.  Given all the good in Ms. Hess's life, it is puzzling to

understand why she began to act more and more bizarre and erratic as she aged.  Why

would Ms. Hess risk her business, reputation, livelihood, and freedom to hug and kiss

her daughter goodnight for something that earned her Donor Services business an average of $33,000/year, less than *half* of her yearly earnings from Sunset Mesa Funeral Foundation and only a small portion of her overall income as an independent entrepreneur?

**iv.    Megan suffered a serious head injury/TBI at the age of 18, the after-effects of which have rippled through her entire life as they've worsened over time.**

*See* FSW Hobby's mitigation memo, pages 8-9, for additional information.

There is a long history associating traumatic brain injury (TBI) with antisocial behavior.  *See* Audrey McKinlay and Michelle Albicini, *"Prevalence of traumatic brain injury and mental health problems among individuals within the criminal justice system"*, Concussion, Vol. 1, No. 4, 25 Nov. 2016, accessible at https://www.futuremedicine.com/doi/10.2217/cnc-2016-001.  People with TBI have difficulties interpreting the facial cues of others and are more likely to have diminished insight into their actions or the consequence of their actions.  *Id.*  Anywhere from a whopping 25-87% of prison and jail inmates report having experienced a head injury or TBI as compared to 8.5% of the general population, and preliminary results from one study suggest that TBI among women in prison is even more common than men.  *Id.*; *see also* https://www.cdc.gov/traumaticbraininjury/pdf/prisoner_tbi_prof-a.pdf, accessed December 9, 2022.

TBIs can also worsen over time, especially if they are left untreated.  Some delayed aftereffects include memory loss, personality changes, and difficulty controlling impulses.  *See* Alina Fong, Ph.D., *Personality Changes After a Brain Injury or Concussion: Anger, Sadness, Social Struggles, and More*, CognitiveFX, last updated September 23, 2022, accessible at https://www.cognitivefxusa.com/blog/personality-changes-after-a-brain-injury-or-concussion.

Impaired self-awareness and a general underestimation of the extent of cognitive and behavior problems after TBI can be a substantial barrier to successful rehabilitation. George P. Prigatano and Mark Sherer, *Impaired Self-Awareness and Denial During the Postacute Phases After Moderate to Severe Traumatic Brain Injury*, Frontiers in Psychology, 2020; 11: 1569 (available online at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7378811/).  Significant issues can be defined as a disturbance in self-awareness that results in a person making behavioral choices and experiencing reactions that negatively impact their functioning in everyday life, including engaging in necessary treatment/rehabilitation activities, self-care activities, maintaining interpersonal relationships, and obtaining and sustaining a productive life.  *Id.*

Denial of symptoms is a psychological method of coping that can affect the accuracy of self-perceptions following a TBI.  *Id.*  The DSM IV classifies denial as a "defense mechanism", that is, an "automatic psychological process that protects the individual against anxiety and from awareness of internal or external stressors or changes."  *Id.*

Various behavioral and emotional responses are associated with denial of neuropsychological impairment after TBI.  *Id.*  Such responses may include disavowing the potential importance of a problem that is recognized by the person, an angry reaction when faced with a performance failure, and avoidance of discussing the impairment and associated disability.  *Id.*  Given this, denial of disability is defined as an emotional reaction (often automatic or non-conscious in nature) that attempts to keep anxiety-provoking feelings and thoughts from reaching the surface.  *Id.*

Megan Hess never sought out or received any sort of treatment for her TBI, either immediately following the incident itself or in the years afterward.  She still struggles with the above-listed issues re: denial, self-awareness, etc.  Nevertheless, she managed to live a productive and law-abiding life until the early-to-mid 2010s, when she started to suffer a distinct and observable cognitive decline, the cause of which all evidence points to being her prior TBI.  She began to experience manic behavior and delusions of grandeur, also both delayed symptoms of TBI.  *See* Fong*, Personality Changes.*

For example, although Ms. Hess was not able to finish college because of her TBI, she started to suffer under the delusion she had a Ph.D. in mortuary science, even going so far as to frame a false degree boasting as such, an absurd manifestation of her increasingly thin line between fantasy and reality.  Emails Ms. Hess wrote during

14

this time reflect a woman in a manic state – delusional, self-important, having important plans and feeling full of great new ideas[3]:

> July, 2010: "Thank you for your interest in the donor program!  We are pioneering this program and I'm so excited to share it with others.  […] Being a donor can change the price of funeral services and cremation, lessening the burden for families.   If someone expresses [sic] no financial resources, no problem..[. ] I want to help EVERYONE!  I have donor programs that fit organ/tissue donation to full body donation.  We have our own crematory, so no one leaves our loving care and affairs are handled quickly."

Ms. Hess's lack of formal post-secondary education as exacerbated by these worsening TBI symptoms also caused her difficulty in distinguishing between the live organ and tissue donation industry and the organ and tissue donation for medical education and research industry, especially as implemented in her professional practice.  In Ms. Hess's mind, she struggled to separate the two and so they ran together as one.

---

[3] This could also be a symptom of bi-polar disorder re: multigenerational mental illness; *see* FSW Hobby's mitigation memo, *supra.*

Sunset Mesa's official minivan even boasted a "Donate Life" license plate,

Donate Life being the nationwide banner organization for live organ and tissue donation:



It is counterintuitive to assume that Ms. Hess would be so brazen about appropriating Donate Life's promotional materials if she was fully aware of the extent of both her intentional and subliminal fraud.

Ms. Hess's preferred slogan for Donor Services was "there are no medical advances without donation and without donation there is no cure."  Ms. Hess truly believed, given her diminished capacity and deteriorating mental state, that her fraud was justified simply because it was serving the genuinely noble cause of medical education and research.  Of course, Ms. Hess's motivations, however warped, are not offered as an excuse for her fraud.  Rather, again, given that Ms. Hess's underlying

motives, when stripped of their mechanisms, were generally wholesome, additional evidence of her cognitive impairment is an important consideration for this Court when determining a sentence sufficient but not greater than necessary to achieve the goals of federal sentencing.

> **v.    Megan Hess, although a bit clumsily, accepted responsibility for her actions and spared everyone the pain of a trial, a mitigating fact not adequately considered by the sentencing guidelines as applied to this particular set of facts.**

Almost all federal criminal cases resolve with plea agreements and trials in the federal criminal justice system are statistically very rare.  However, older offenders were more than twice as likely to proceed to trial than their younger counterparts during fiscal year 2021:



*See* Tennyson, et. al., *Older Offenders*, p. 30

Even though Ms. Hess was statistically more likely to proceed to trial, especially given her charges, she instead chose to accept responsibility for her actions and plead guilty to the stipulated facts as set forth in the plea agreement.

In their PSR, United States Probation cites to *U.S. v. Rathburn* re: Defendant Arthur Rathburn, who was sentenced in 2016 for similar conduct.  Unlike Mr. Rathburn, however, Ms. Hess did not proceed to trial.  Unlike Mr. Rathburn, Ms. Hess did not give a lengthy oral allocution continuing to assert her innocence even after being found guilty of 8 different crimes by a jury of her peers.  Unlike Mr. Rathburn, Ms. Hess has never filed any pro se Motions, tried to fire counsel, or employed any other tactics intended to undermine either this Court or the rule of law.[4]

Notwithstanding his lack of remorse and regularly disrespectful behavior, Mr. Rathburn received a bottom of the guidelines sentence of 108 months.  Ms. Hess deserves similar if not better treatment given her acceptance of responsibility and humbled, consistent silence.  Megan Hess has never filed a pro se Motion; given a salacious interview to the media or used this case for her own personal gain; lashed out, attacked, or harassed any of the witnesses/next of kin, or; made a statement to this Court indicating she did not totally and wholly accept responsibility for the offense and fully admit to the facts in the plea agreement.

It is also important for this Court to note that every delay in this case has been attributable to either issues with Co-Defendant's former counsel Steve Laiche/Co-

---

[4] Undersigned counsel obtained and reviewed U.S. v. Rathburn's entire CM/ECF file, including transcripts of his trial and sentencing hearing.

Defendant's mental health issues or undersigned counsel and her co-counsel's adherence to their duty to provide effective assistance, especially in a case with over half a million pages of discovery, almost an entire room full of physical evidence at the FBI's headquarters in Denver, and numerous novel legal and factual issues to identify and resolve.  *See also U.S. v. Goldberg*, 937 F.Supp. 1121 (M.D.Pa. 1996) (where upward departure was warranted under sentencing guideline for defendant's obstruction of justice during prosecution of offenses through repeated filing of frivolous motions, often filed pro se without leave of court; through misrepresentations to court, and; through causing court to convene hearings with no substantial basis, all of which was intended to have the effect of delaying and disrupting proceedings).

**18 U.S.C.A. § 3553(a)(1), part two - The Court Shall Consider the Nature and Characteristics of the Offense:**

**i.      The anatomical gift industry for the purposes of medical education and research is a totally legitimate industry without which no medical professional would have the ability to properly learn their job.**

Although, as the plea agreement drafted by the government and signed by Megan Hess correctly states, Ms. Hess either "lack[ed] authorization" or "exceeded the authorization [she] obtained" to recover body parts and sell them to various medical companies, most notably companies like Innoved, Corcoran Laboratories, and others,

there is nothing illegal about the general, widespread, and vital practice of recovering, storing, shipping, and charging fees in connection with human remains for the purpose of medical research and education.  Indeed, but for the dozens and dozens of body broker companies operating in the United States alone, no future physician would be able to study a physical human specimen, nor would current physicians be able to continue to learn new advancements, techniques, and breakthroughs in their respective specialties.

In the late 90s and early 2000s, there became a growing need for human body donations for doctors and surgeons to use for practice.  The large rise in the need for body and tissue donation is attributable to the ever-increasing variety of surgical procedures as medicine continues to evolve.  This rise in need has led to a new line of body brokering businesses, who supply various samples to medical schools for not only medical students but also current health care workers like paramedics, doctors, and nurses.  *See* Amanda Loudin, *Donating Bodies to Science Carries Risks and Benefits*, WebMD Health News, March 25, 2022, accessible at https://www.webmd.com/a-to-z-guides/news/20220325/donating-bodies-carries-risks-and-benefits.

Unfortunately, the supply of organ and tissue donations for research and education has not kept up with increasing demand.  *See* Anuba Saha, Aniruddha Sarkar, and Shyamash Mandal, *Body Donation after Death: The Mental Setup of Educated People*, J Clin Diagn Res. 2015 Jun; 9(6): AC05–AC09, accessible at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4525495/.  For example, given that there is no body donation industry in places like the Middle East, organ and tissues are

imported from abroad.  *See* Nerissa Naidoo, et. al., *In death there is life: perceptions of the university community regarding body donation for educational purposes in the United Arab Emirates*, Heliyon, v.7(7); 2021 Jul., accessible at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8333108/.

In Colorado, the Colorado State Anatomical Board, created per statute in 1927 as a state agency and located at the Anschutz Medical Campus at the University of Colorado, highlights the mounting need for body donations for the purpose of education and research on their website, stating that "[h]uman anatomy is the basis of all medical knowledge, and can only be learned by anatomical study."  Their website goes on to expound on this philosophy, stating the following:

> "Anatomy is at the foundation of any course of study for health professionals from physicians, nurses, and physician assistants to dentists and physical therapists.  That is why body donation plays a pivotal role in educating our future health care professionals.   Such generosity assists students in understanding the complexity and intricacy of human anatomy but can also be helpful to researchers studying new surgical or regenerative techniques to better serve patients."

*See* https://medschool.cuanschutz.edu/state-anatomical-board, accessed December 9, 2022.

Colorado Mesa University, which was contracted to test hundreds of the cremains in the instant case, runs their own "body farm" in nearby Whitewater, Colorado, where both students and professionals alike "learn and teach about the decomposition of human remains in the western Colorado environment."  *See* https://www.coloradomesa.edu/forensic-investigation-research-station/index.html, accessed December 9, 2022.

The federal government uses human cadavers for everything from weapons and explosion testing to simply observing and documenting what happens when a body is left in an open field to decompose naturally and is also not without historical fault when it comes to the appropriate handling of human remains.  In 2004, Tulane University admitted to providing bodies to the U.S. Army, who then used them for landmine experiments without the appropriate authorization.  *See* "USA Bodybrokers Industry", https://www.reuters.com/investigates/special-report/usa-bodybrokers-industry/, originally published 2016, accessed December 9, 2022, with the accompanying photo:



ARMY EXPERIMENT: This photo of an Army experiment at Aberdeen Proving Ground in Maryland shows how cadavers are being used to test the impact of explosions on the human body. The photograph, taken in September,  has been modified by the military to show only outlines of the two female cadavers, one colored orange, the other yellow. REUTERS/U.S. Army/Handout

Given this fuller, but still incomplete picture of what organ and tissue donation for medical education and research looks like, the FBI's labeling of their investigation as "Operation Morbid Market" was grossly misleading and served only to prey on the general public's lack of knowledge about the body donation industry as well as society's

collective discomfort in confronting various issues and themes surrounding the practical nature of death and dying.  The FBI's characterization of anything other than Ms. Hess's *unauthorized* recovery of remains as a wrong or criminal act purposefully set off a firestorm of raw emotion among the next of kin and promulgated misconceptions and hyperbole both around the facts of the instant case and the body donation industry in general, both of which still abound to this day and will be touched upon in the next section.

ii.     **Various misconceptions about the evidence in this case have been promulgated by various parties, most notably the media, which has only served to excessively vilify both Megan Hess and the general mission of organ and tissue donation for medical education and research.**

In her book "Stiff: the Curious Lives of Human Cadavers," Mary Roach quips that "dissection and surgical instruction […] requires a carefully maintained set of illusions and denial."  There is no better example of this than the general public's collective reaction to the Sunset Mesa case and how the case has been injected with repetitive, extreme hyperbole since its inception.  There have been nearly 200 posts in a public Facebook group entitled "Sunset Mesa Crimes" portraying Ms. Hess as evil and organ and tissue donation overall as a disreputable, seedy enterprise.  A few select next of kin have made this one unfortunate event their entire identity, oftentimes speaking as if Ms. Hess had brutally *murdered* their loved ones, not merely sold their loved ones' partial or

whole remains to medical education and research companies.  Various media outlets have made outrageous claims about both Ms. Hess and her professional practices based on little to no evidence.  Podcasters and documentarians have spewed gruesome and disrespectful language about both Ms. Hess and the industry over a soundtrack of dissonant synthesizers spiked with the tinny staccato of high-pitched violins – soundtracks more appropriately utilized in a Halloween haunted house than a media story regarding the unauthorized recovery of organs and tissues for medical education and research.

This hyperbole has continued to proliferate while Ms. Hess has offered no rebuttal.  While acknowledging her guilt as set forth in the plea agreement, Ms. Hess would nevertheless encourage this Court to consider the following clarifications:

1. The government has failed to prove that most of the donations were not authorized.  *See also* Defendant Megan Hess's Objections to PSR (ECF #262), pp. 13-14.

2. Even though there was no requirement for FDA certification, Megan Hess did so, and never had any violations during her inspections.  *See* Exhibit C, FDA registration for Donor Services and FDA database referencing 2012 inspection.

3. The lab at Colorado Mesa University was never able to identify the presence of substances like kitty litter or concrete in the cremains, but all the ashes that were tested did have HUMAN cremains.  Additionally, the government has since admitted in a recent filing that the FBI never found any kitty litter or

concrete in the tested cremains, which is merely one example of the hyperbole parroted by the next of kin as additional justification for their request to this Court to figuratively deliver them Ms. Hess's head on a platter. *See* Government's Response to the Presentence Investigation Report as to Defendant Shirley Koch (ECF #261), p. 6.

4. The concrete mix found at Sunset Mesa was used to construct the bases of headstones and affix them to graves, materials that would be found in the back rooms of any mortuary or funeral home handling headstone retrieval and placement.  Again, the government has since admitted that the FBI never found any concrete or similar material in the tested cremains.  *See* Exhibit D*, photos of concrete foundation, Quikcrete and tools.*

5. Decedents were cremated in their clothing, and many decedents had medical device implants, providing reasonable explanations for the various small metal objects and items found in some cremains samples, i.e. springs, rivets, screws, rods, fasteners, etc.  *See also* Exhibit E, a photo of larger pieces of post-cremation metal taken from Sunset Mesa's cremation furnace for disposal (only smaller pieces could fit in the cremains containers given back to families.)

iii. **Bluntly stated, although Ms. Hess's crimes, as prosecuted under the federal mail fraud statute, may have invoked an emotional response depending on a person's individual beliefs, they did not result in any**

> **permanent, financial damage to any of the next of kin, and do not**
>
> **justify an emotional response from the federal Court.**

Even though Ms. Hess's fraud was sustained over a period of years, nobody was injured or killed as a result, her actions were not violent, and she did not swindle any next of kin out of any substantive sum of money.  If portions of a decedent were donated, the remainder was cremated and returned to the next of kin as originally agreed-upon.  In cases where a whole body was donated, research companies would sometimes return bodies for cremation and the cremains would then be provided to NOK.  *See* Exhibit F*, DSI advisement of donation options including reference to return of cremains "likely but not guaranteed."*

The loss of either some or all a decedent family member or friend's remains, although admittedly a potentially emotional subject depending on any one individual's personal views and/or spiritual beliefs, does not rise to the level of fraud typical in cases where defendants received substantial prison sentences or upward variances.  For example, in *U.S. v. Castaldi*, 743 F.3d 589, 593 (7th Cir. 2014), the district court read aloud and summarized letters from victims describing how the defendant had deprived them of their life savings, college money for their children, money saved for retirement, money for medical care, and life insurance money.  One of the *Castaldi* defendant's last victims described how he convinced her family to take out a new mortgage for $200,000 and invest it with him, meaning it was lost forever.  One letter pointed out that on November 15, 2008, when the defendant knew his scheme was collapsing, he conned

his own 92-year-old aunt to "invest" $120,000 with him so she could pay a caregiver with the interest.  (The aunt's money was also lost, of course.)

The *Castaldi* Court, in imposing an above-guideline sentence of 276 months, noted the defendant's 22 years of fraud, his hundreds of victims, and their tens of millions of dollars in collective losses, specifically mentioning that many of the victims were people of retirement age who had originally immigrated from Italy and "doggedly sav[ed] their earnings […] to provide security for themselves, their children, and to perhaps leave a financial legacy to their children and their grandchildren," making defendant's crimes "especially heinous."

Here, Ms. Hess, as stated previously, charged far below market prices for both her funeral home services and organ and tissue donation services.  Her earnings from the Donor Services venture were mediocre at best and barely covered her costs of doing business.  She did not cheat anyone out of their retirement, deplete any child's college fund, or rob a nonagenarian aunt from her ability to pay for home health care.  Here, Ms. Hess's *emotional* fraud in no way justifies the severe prison sentence sought by the government and United States Probation alike, and is not an appropriate basis for a harsher sentence.


**18 U.S.C.A. § 3553(a)(2)(A) – The Court Shall Consider the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

Megan Hess's legacy has been forever tainted by this case and the collateral consequences she has suffered and will continue to suffer are severe.  Megan Hess is now a convicted felon.  She will be going to prison for a term of years.  The facts of this case will follow Ms. Hess and her daughter for the rest of their lives (*see also* FSW Hobby's mitigation memo, *supra*).  Likewise, if the dozens and dozens of requests from various media entities undersigned counsel has received (and ignored) since March of 2020 are any indication of what's to come, the case will be memorialized in at least one documentary or docu-series sooner rather than later, dependent only on which documentarian reaches the figurative finish line first.[5]

Ms. Hess's loss of profession and reputation should be considered when determining what constitutes just punishment, *see*, e.g., *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

---

[5] *See also* https://www.cremainsunknown.com/, accessed December 14, 2022.

In addition to the loss of her profession and reputation in the community, Megan Hess and her daughter have been relentlessly harassed since 2018, both by civilians and the media.  The details of this harassment are outlined in FSW Hobby's mitigation memo, specifically pages 19-23.  One notable instance of harassment is when Ms. Hess woke up to various bloody and dismembered plastic body parts strewn in the front yard of her small, suburban-style home, parts she scrambled to remove before her 8-year-old daughter awoke from her bedroom and could see what had happened but after quickly memorializing the vandalism with the below pasted photos,:



Undersigned counsel experienced only a taste of the public harassment Megan Hess has received in recent years as she was leaving the Aspinall Courthouse after the July 5, 2022 change of plea hearing.  Even though court staff instructed the audience to remain in the courtroom immediately following the adjournment of the hearing, a few

audience members had left early and were waiting on Rood Avenue to hurl insults directly at the Defendant and her counsel as they emerged from the courthouse doors, "bitch" being the only insult counsel could clearly decipher before hurrying away.

Ms. Hess has been figuratively tarred and feathered by the local community as much as one can in the 21st century.  Even Ms. Hess's local state representative has entrenched himself in almost every facet of the case for his own personal political gain, "liking" many Facebook posts on the "Sunset Mesa Crimes" Facebook group and publicly requesting this Court impose the statutory maximum sentence without any regard for the nuance and intricacy federal sentencing requires.  He, too, appears in every documentary or media story generated about Sunset Mesa, never missing an opportunity to attach his name to the narrative hyperbole while simultaneously slandering the sanctity of the Constitutional criminal process entrenched in the V and VI Amendments on Twitter as "pre-trial doldrums":



**Representative Matt Soper** ✔
@SoperMatthew                                    ・・・

After years of pre-trial doldrums in the Sunset Mesa funeral home case, I'm pleased to see a plea deal being entered into.

I've run a couple bills to address the Sunset Mesa atrocity, including making abuse of a corpse a felony and giving DORA the power to investigate.

**18 U.S.C.A. § 3553(a)(2)(B) - The Court Shall Consider the Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct.**

Research has consistently shown that while being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels […] reached that conclusion, as has every major survey of the evidence."; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).  The Cambridge report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  It examined the effects of changes to both the certainty and severity of punishment.  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates […] were not sufficient to achieve statistical significance."  *Id.* at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  *Id.* at 1.

Research regarding white collar offenders in particular found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence […] prisons do not reduce recidivism more than noncustodial sanctions." *See* Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Everyone who works in both the funeral home industry and the medical donation industry is aware of this case; it has been reported on by almost every major media outlet in the world, including but not limited to Reuters, the New York Times, NY Post and Associated Press. *See also* Grow, Brian. "Special Report: FBI Scrutinizes Funeral Home with Side Business – Selling Body Parts." *Reuters*. 11 January 2018. Traub, Alex. "Funeral Home Operator Pleads Guilty in 'Illegal Body Part Scheme.'" *NY Times*. 5 July 2022. Reilly, Patrick. "Colorado Funeral Home Operator Admits to Selling Body Parts for Cash." *NY Post*. 5 July 2022.

Local, Colorado-based news outlets have also regularly published articles about the case including the Montrose Daily Press, Grand Junction Sentinel, Colorado Public Radio, Denver Post, Westword, Colorado Sun and High Country News.

The totality of the deterrent circumstances in Ms. Hess's case are enough to make any casual observer take pause, especially given the broad nature of federal

criminal law and Ms. Hess's crime of conviction, i.e., "mail fraud."  Any sentence in Ms.

Hess's case sends a message that any type of fraud, no matter how ill-defined, can be

prosecuted under federal fraud statutes as long as certain low-lying jurisdictional

thresholds, such as crossing state lines or affecting "interstate commerce", are met.

Thusly, any sentence the Court hands down has a deterrent effect, not just a long one.

**18 U.S.C.A. § 3553(a)(2)(C) - The Court Shall Consider the Need for the Sentence Imposed to Protect the Public from Future Crimes of the Defendant.**

In imposing the least sentence sufficient to account for the need to protect the

public, this Court should consider the statistically low risk of recidivism presented by Ms.

Hess's history and characteristics.  *See, e.g., United States v. Darway*, 255 Fed. Appx.

68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-

offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the

district court abused its discretion in not taking into account policy considerations with

regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d

997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's

age, which made it unlikely that he would again be involved in a violent crime); *United

States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering

low risk of recidivism indicated by defendant's lack of criminal record, positive work

history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D.

Mass. 2008) (granting variance because defendants "with zero criminal history points

are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F.

Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

There is no chance Megan Hess will ever work in the funeral home industry again and if she survives her prison sentence to release, she will re-enter society as a convicted felon.  The stigma of this crime will follow her the rest of her life – any simple Google search destroys any opportunity for anonymity.  She has little formal education past high school and no advanced degrees.  Tantamount to this Court's consideration, however, should be the fact that Ms. Hess led a law-abiding life up until her cognitive deterioration underlying her fraud in the instant case, and once "caught" in 2018, two years before she was even indicted, she immediately ceased all criminal activity, choosing instead to run a craft business on Etsy.  She has not committed any crimes or violations of pretrial release in any capacity and continues to be a contributing member of her community as well as a loving and doting mother, even given the harsh set of circumstances under which she is living.  The public is in no danger from Ms. Hess, and so this sentencing factor weighs heavily in favor of a more lenient sentence.

**18 U.S.C.A. § 3553(a)(2)(D) - The Court Shall Consider the Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Corrective Treatment in the Most Effective Manner.**

The sentence imposed must ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

Approximately 12-14% of federal offenders who are sentenced in any given year are considered "older."   Of that 12-14% subsect, only 15% are female.  Tennyson, et. al., *Older Offenders*, p. 42.  As Ms. Hess ages, she will require specialized women's health care that will more than likely be unavailable to her in federal custody.  A recent study published in the July 2021 issue of The Journal of the North American Menopause Society concluded that "[i]ndividuals going through the menopause transition while experiencing incarceration have significant unmet needs and poor access to relieving lifestyle changes or medical interventions."  *See* Elana F. Jaffe, MPH, Aunchalee E. L. Palmquist, PhD, MA, IBCLC, and Andrea K. Knittel, MD, PhD, *Experiences of Menopause During Incarceration*, Journal of the North American Menopause Society, July 2021, *accessible at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8495613/.

Ms. Hess is also at risk of not only the normally accelerated cognitive decline experienced by older incarcerated offenders, but an even faster-than-usual accelerated decline as compounded by her previous traumatic brain injury.  Chronic disease management is crucial for improving the lives of TBI survivors, who, despite initial

hospitalization and inpatient rehabilitation services, still face statistically high odds that they will experience further decline in their daily lives in the years following their injury. *See* https://www.cdc.gov/traumaticbraininjury/pdf/moderate_to_severe_tbi_lifelong-a.pdf, accessed December 9, 2022.  Traumatic brain injury can triple the risk for early death.  *See* Seena Fazel, MD, Achim Wolf, MSc, Demetris Pillas, Ph.D., et. al., *Suicide, Fatal Injuries, and Other Causes of Premature Mortality in Patients With Traumatic Brain Injury,* JAMA Psychiatry, March 2014, accessible at https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1812719.

If Ms. Hess receives an unusually high prison sentence, she is more likely to die before release given her heightened risk for early death.  Ms. Hess needs rehabilitative treatment in order to stave off the neurological degeneration that has already taken place and will no doubt hasten while she is in prison.  In prison, she will be unable to attend her daughter's semi-weekly concerts and recitals or tend to her thriving, creative-based online business, the two things on which she spends most of her time and energy.  In prison, she will be hundreds of miles away from the only home and the only people she has ever really known.  In prison, her brain will atrophy exponentially with each passing year.  Therefore, this sentencing factor weighs heavily in favor of a shorter sentence.

## 18 U.S.C.A. § 3553(a)(a)(3) – The Court Shall Consider the Kinds of Sentences Available.

Here, unlike in many other federal cases, there is no statutory minimum sentence.  Ms. Hess is, technically, legally eligible for an alternative sentence such as

home confinement.  Although Ms. Hess is not specifically requesting that type of alternative sentence, she would be remiss if she did not remind this Court it is available, especially if the Court agrees with her arguments regarding loss and adjusted offense level as calculated by the government and United States Probation.  (If the Court agrees with all of Ms. Hess's arguments regarding the adjusted offense levels, particularly as they apply to loss, Ms. Hess's guideline range is only 4-10 months.)

If Ms. Hess receives a prison sentence, she is likely to be assigned to FCI Dublin, one of only six federal women's facilities in the United States.  FCI Dublin has been plagued with a plethora of sex assault scandals in recent years – just recently, December 8, 2022, its former Warden, Ray Garcia, was convicted of eight counts of sexual abuse and lying to the FBI.  During Garcia's trial, jurors heard evidence of how he repeatedly sexually assaulted one woman in a prison bathroom and a warehouse, showed her photos of his penis, and forced her to pose in a pornographic manner in a prison cell, amongst a variety of other heinous acts of sexual assault against incarcerated women.

Garcia is only one of five correctional officers at FCI Dublin to face sex abuse charges in recent years amid widespread accusations of staff misconduct.  The accusations are so persistent that prisoners and officers now reportedly refer to the facility as "the rape club."  See *Former warden at female prison known as 'rape club' guilty of sexually abusing women behind bars*, Los Angeles Times, December 8, 2022, accessible at https://www.latimes.com/california/story/2022-12-08/ex-warden-at-female-prison-guilty-of-sexually-abusing-inmates.

**18 U.S.C.A. § 3553(a)(4) – The Court Shall Consider the Kinds of Sentence and the Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant As Set Forth in the Guidelines.**

In the interest of brevity, Defendant refers the Court to its objections to the government and probation's adjusted offense levels as applicable to the instant Defendant, filed on December at ECF #262.

In essence, Ms. Hess argues in her objections that the government and probation's guideline calculations rely on an incorrect interpretation of the meaning of "loss" under federal criminal law and are deeply flawed.  Ms. Hess also argues that other adjusted offense levels have been incorrectly applied.  As previously stated on page 2 of this memorandum, if the Court grants Ms. Hess's objections to the guideline applications and loss calculations, the sentencing guideline range is significantly reduced from both the government and United States probation's current assessment.

**18 U.S.C.A. § 3553(a)(5) – The Court Shall Consider Any Pertinent Policy Statement.**

The United States Sentencing Commission is a bipartisan, independent agency located in the judicial branch of government.  It was created by Congress in 1984 to reduce sentencing disparities and promote transparency and proportionality in sentencing.  Its principal purpose is to establish sentencing policies and practices for the federal criminal justice system that will assure the ends of justice by promulgating detailed guidelines prescribing the appropriate sentences for offenders convicted of

federal crimes.  According to the Commission, the "basic purposes of criminal punishment" are fourfold: "deterrence, incapacitation, just punishment, and rehabilitation."

Defendant urges this Court to reject USP's bold assertion that the guidelines have "[no] bearing on the facets of this case."  (PSR, exhibit A, page R-5X). On the contrary, this Court is *required* to consider the 3553 factors when determining a sentence that is sufficient but not greater than necessary to accomplish the goals of federal sentencing, which by statute includes an analysis of the advisory sentencing guidelines as a jumping-off point.  *See also U.S. v. Booker*, 543 U.S. 220 (2005).  This Court should, therefore, totally disregard USP's baseless recommendation and eschew anything less than a detailed analysis of the guidelines, especially given the novel and complex nature of the issues in the instant adjusted offense level calculation.

**18 U.S.C.A. § 3553(a)(6) – The Court Shall Consider the Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct**.

Drastic upward variances such as the statutory maximum are reserved for Defendants with extensive criminal histories or who have committed the most heinous of crimes or who have demonstrated a repeated commitment to criminal activity after being imprisoned, sometimes even after being imprisoned multiple times.  *See U.S. v. Kelley*, C.A.8 (Ark.) 2011, 652 F.3d 915 (Sentence of 240 months in prison as an upward variance following defendant's guilty plea to possession of child pornography,

which was to be served consecutively to a state court sentence for rape, was not an abuse of discretion, where court considered serious nature of defendant's predatory offenses, need to protect public from those types of offenses and defendant's history of absconding); *U.S. v. Kapordelis*, C.A.11 (Ga.) 2009, 569 F.3d 1291 (where 420 month sentence upward from the guideline range of 262-327 months for defendant convicted of producing child pornography was reasonable where defendant had been drugging and molesting minors for at least 20 years); *U.S. v. Jenners*, C.A.8 (S.D.) 2008, 537 F.3d 832 (district court's upward variance of 96-month sentence was reasonable given, amongst other factors, the defendant's "lengthy" history of criminal conduct); *U.S. v. Jeter*, C.A.6 (Ohio) 2013, 721 F.3d 746 (where the district court adequately justified its upward variance, emphasizing defendant's previous gun crimes, criminal record, and prior periods of confinement, and stating that it was imposing a "severe sentence" in large part because of the "kind of record" defendant had amassed, stating that "enhancement of the sentence is necessary to protect the public through incapacitation of this defendant as to whom prior periods of confinement did not work"); *U.S. v. Scott*, C.A.10 (Okla.) 2008, 529 F.3d 1290 (where district court did not abuse its discretion in varying upward from 70-87 to impose a 120-month sentence; factors court relied on, including defendant's related unconvicted conduct of trafficking several women other than victim in the case, including another juvenile, duration of defendant's prostitution activities, and callousness and cruelty with which he treated victim and others in his employ, were relevant to statutory sentencing factors.); *United States v. Johnson*, C.A.8 (Mo.) 2019, 916 F.3d 701 (where district court did not abuse its discretion in sentencing

defendant to 204 months in prison upon his guilty plea to possession with intent to distribute cocaine base, which was upward variance from sentencing guideline range of 57 to 71 months, where court noted defendant had a conviction for second-degree murder and 107 conduct violations in prison, defendant also had many violations of release conditions and prior drug trafficking convictions, as well as a domestic assault conviction, and court disagreed with guidelines giving zero weight to defendant's criminal history.) *U.S. v. Lente*, C.A.10 (N.M.) 2014, 759 F.3d 1149 (where district court's decision to vary upward from defendant's 46- to 57-month advisory Guidelines range and impose a 192-month sentence for involuntary manslaughter and assault resulting in serious bodily injury was substantively reasonable; defendant acted with extreme recklessness when she decided to drive after consuming between 13 and 19 beers, and her actions caused three deaths.).

Megan Hess has led an otherwise law-abiding life and her criminal behavior did not manifest until her late 30s, which is, again, compelling evidence of the after-effects of her TBI.  She has never been violent and in all other respects, has been a model citizen and community member, even after she was raided by the FBI in 2018.  She has never shown this Court or any of the next of kin an iota of disrespect by attacking either them or the proceedings themselves, nor has she used her current predicament for any type of attention or financial gain through media interviews, book deals, etc.  She readily accepted responsibility once defense counsel finished their review and investigation of an incredibly dense case file and is prepared to go to prison for a period of time as the ultimate punishment for her crimes.  As discussed previously, Ms. Hess's

circumstances, outside the factual allegations, have almost nothing in common with Arthur Rathburn, who still received the benefit of a 108-month, bottom-of-the-guideline sentence.  This penultimate 3553 factor weighs heavily in Ms. Hess's favor.


**18 U.S.C.A. § 3553(a)(7) – The Court Shall Consider the Need to Provide Restitution to Any Victims of the Offense.**

Ms. Hess already has a substantial financial obligation to the victims in this case. In addition to the instant criminal case, Ms. Hess and her entities have been named in seven civil lawsuits filed in Montrose County and judgments totaling in the millions of dollars have already been entered against her.

Given that the restitution hearing in this matter has been bifurcated and is not scheduled until March of 2023, Ms. Hess reserves the right to supplement any argument as to restitution at a later date.


**CLOSING**


18 U.S.C.A. § 3553(b)(1) provides this Court with the option of varying downward or imposing an alternative sentence if the Court finds that there exists a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.  Here, various mitigating factors not adequately taken into consideration are present, the most important of which being the gross undervaluing of the departure provision for acceptance of responsibility given

the instant set of facts.  Ms. Hess will only receive a three-level adjustment for her acceptance of responsibility, the same credit she would get for pleading guilty to, say, a drug conspiracy charge, any jury trial for which would likely last less than one week and involve mostly if not all government or co-conspirator witnesses.

Here, given the amount of persistent, ongoing emotional anguish claimed by the next of kin even years after speaking with the FBI or learning about the case, Ms. Hess's acceptance of responsibility, however ineloquent, should be afforded greater consideration when determining an appropriate sentence – her originally scheduled jury trial was expected to last 3-4 weeks and would have required dozens of civilian witnesses to testify about their deceased loved ones, the process of doing so would have only served to reopen old wounds and cause the next of kin to suffer emotional distress.

Probation's assertion that the guidelines simply don't matter is indicative of the slippery slope of emotion that threatens to derail appropriate sentencing in this case. Federal criminal sentencing is grounded in reason, not passion.  Punishment is only 25% of its purpose.  The facts and evidence as applied to federal statutes and case law do not support a de facto life sentence of 20 years in prison, the likely sentence Ms. Hess would have received had she gone to trial and lost.

Probation also urges this Court to impose the maximum sentence while stating that "the [next of kin's] pain runs deep and while no sentence will undo the harms of this crime, the victims find some solace in the [potential] imposition of a significant sentence."  This is a wholly inappropriate rationale for requesting the statutory

maximum sentence.  Guidelines and sentencing statues exist *specifically* to guard against the naturally occurring knee-jerk reaction to sentence a Defendant based on how a case makes someone *feel*.  The goal of federal sentencing is not to make a victim whole or figuratively "undo" the harms of a crime.  Renumeration for emotional losses is only an appropriate issue in civil court.

Even as various (but not even the majority of) next of kin use the media to publicly call for blood in the form of the harshest potential sentence, low-level state politicians with no personal connection to the case attempt to use what little influence they have to pressure a Federal District Court into doing what they want, and criminal justice professionals who surely know better advocate for the total disregard of the USSC sentencing guidelines, the remainder of us – the lawyers in the room, up to and including this Honorable Court - must take their respective oaths to uphold the law that much more seriously, and apply that law in the type of reasonable, mathematical, and emotionless manner federal sentencing demands.

On June 28, 2022, Ghislaine Maxwell, Jeffrey Epstein's co-conspirator, after having been found guilty of five sex-trafficking-related counts involving minors, was sentenced to United States Probation's recommendation of 240 months, a *downward* variance from her correctly-calculated guideline range of 292-365 months.  Ghislaine's official sentencing statement pushed themes of what has commonly been referred to as "affluenza" and blamed Jeffrey Epstein and her father, Robert Maxwell, for her criminal behavior.

Conversely, Megan Hess, unlike Ghislaine Maxwell and so many other criminal defendants, specifically those who refuse to accept responsibility for their actions by proceeding to trial or continuing to claim innocence via lengthy allocutions to the Court after conviction, does not blame anyone but herself for her fraudulent behavior.  She has stepped up to the plate, pleaded guilty and admitted to the stipulated facts in the plea agreement.  She is ready for an appropriate punishment.

Megan Hess did not kill.  She did not rape.  She did not rob anyone of their life savings.

She does not deserve the same severity of sentence as Ghislaine Maxwell, and so many other defendants who have inflicted far greater harms on living, breathing human beings.

<div style="margin-left: 50%;">

s/Ashley Marie Petrey
Attorney for Ms. Hess
AP Law, Ltd.
405 Ridges Boulevard, Suite B
Grand Junction, CO 81507
P: (970) 812-5234
F: (970) 414-3009
ashley@aplawltd.com

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2022, I served the foregoing through

CM/ECF, which will send electronic notification to the Court and parties.


s/Ashley Marie Petrey